## SINCLAIR OIL & GAS CO. et al. v. ALLEN.

No. 19442. Opinion Filed June 3, 1930.

Edw. H. Chandler, Summers Hardy, and Robt. L. Imler, for plaintiff in error Sinclair Oil & Gas Company.

Koener, Fahey & Young and Joe T. Dickerson, for plaintiff in error Roxana Petroleum Corporation.

J. C. Denton, J. H. Croker, R. H. Wills, H. M. Gray, and I. L. Lockewitz, for plaintiff in error Mid-Continent Petroleum Corporation.

E. L. Swigert and Curran, Sturgis & Curran, for defendant in error.

DIFFENDAFFER, C. This action is to recover damages alleged to have been caused by the pollution of a stream running through plaintiff's farm, by casting therein salt water, crude oil, and base sediment from oil wells, etc.

Plaintiff, among other allegations, stated in her petition that the 160 acres of land involved were purchased and were chiefly valuable for stock breeding and stock raising purposes, and had been used for such purposes since about 1899, and that by reason of the contour, etc., of said land, and the location of the stream, etc., together with the timber growing along the banks thereof, the farm was very valuable for stock breeding and stock raising purposes; that defendants were producers of oil, etc., from certain leases owned by them within the drainage area of said stream and above plaintiff's farm; that in the operation of their leases, defendants had brought and were bringing to the surface large quantities of crude oil, base sediment, salt water, and other oil field refuse, poison, etc., which by and through their drainage systems, defendants had drained in large quantities into said stream and on and through her land, thus destroying the usefulness of said stream as a source of water supply for her stock, etc.; that said salt water, etc., have penetrated the soil on each side of the stream for a considerable distance and destroyed the vegetation and killed a large number of trees growing thereon, and had thus rendered it impossible for plaintiff to raise and pasture stock and carry on her business on said land; that prior to the pollution of the waters of said stream, etc., the fair market value of said land was $15,000, and that, after such pollution, the same has been reduced in value to not to exceed the sum of $5,000, and alleged that if said pollution continues said land will be further reduced in value, "but that plaintiff is only now complaining of the damage done to this date." She also alleges that two of her herd of about 59 cattle had died from drinking the polluted water, and the balance of the herd had been injured and reduced in value, etc., to her damage in the sum of $500. She prayed for damages in the sum of $10,500.

Defendants Sinclair Oil & Gas Company and Roxana Petroleum Corporation answered by general denial. Defendant Mid-Continent Petroleum Corporation answered by general denial, and, in substance, that:

"In so far as it has operated and developed said leases and said leasehold estates, or any

of them, it had the lawful right so to do, and that all of its acts and conduct in connection therewith were necessary and incident to the use and enjoyment of such right, title, interest, equity, or estate, as is, or was, owned by it in and to said leases and, said leasehold estates, and that if the aforesaid acts and conduct, or any other acts or omission of said defendant, have at any time resulted in injury or damage to said plaintiff, which is expressly and specifically denied by said defendant, the same was unintentional and without negligence or malice on the part of said defendant, and that in so far as said defendant has operated said leases and said leasehold estates, or any of them, it has at all times made every reasonable effort to prevent the escape of salt water, oil, base sediment, or other refuse therefrom, and to prevent injury or damage to said plaintiff."

All defendants, in a joint supplemental answer, alleged, in substance, that plaintiff was the owner of the land involved and also 160 acres adjoining same on the north; that said land owned by plaintiff was leased for oil and gas mining purposes, and that plaintiff's lessees had at all times mentioned in plaintiff's petition been bringing to the surface large quantities of salt water, base sediment, etc., which was allowed to flow over and across said land and into said stream, causing in whole or in part the damages complained of by plaintiff. The cause was tried to a jury resulting in a verdict for plaintiff in the sum of $4,000 upon which, after unsuccessful motion for new trial by defendants, judgment was entered. Defendants appeal, and all join in a single petition in error.

The item of $500 alleged damage for the death of two cattle and injury to others was withdrawn from the jury by the court for want of evidence to support same.

The defense that plaintiff through her lessees contributed to the pollution of the stream was submitted to the jury by an instruction not excepted to by defendants, and this question is not here involved.

There are some 25 assignments of error, but only 10 of them are presented in the briefs. As we view the entire record, but three questions are, in fact, presented:

First. Whether the court erred in overruling the demurrer of defendants to plaintiff's evidence.

Second. Alleged error in presenting to the jury the question of whether or not the damage sustained by plaintiff, if any, was permanent, and

Third. Whether or not the verdict and judgment is excessive.

The evidence of plaintiff shows, in substance, that defendants had allowed oil, salt water, and base sediment to escape from their leases and flow down the stream across plaintiff's land as alleged in the petition, from about November, 1925, to October, 1927; that thereby some 375 trees growing along and near the banks of the stream were killed; these trees ranged from four inches to three feet in diameter; that prior to the pollution of the stream, the water, which was of nearly constant flow, was pure and wholesome, and was substantially the only source of water for her livestock which she was accustomed to pasture on said land during the spring, summer, and fall months, to the extent of 48 or 50 head; that, after about November, 1925, she was unable to pasture more than six or eight head, because of the limited water supply which she was able to obtain from a well on said land. She attempted to show a diminution in the market value of the land caused by the pollution of the stream. To show this her counsel produced a number of witnesses who testified substantially as shown by the following from the examination of one of her principal witnesses:

"Q. John, what would be the fair reasonable value of that farm with the waters unpolluted and the trees undisturbed by the salt water and the trees alive as they were before, what would be the fair reasonable value of that farm in that condition? A. Approximately $100 an acre. Q. What is its value in the condition that it now is with the waters polluted and the trees killed? A. My opinion of the case is that there wouldn't be a man in the country would pay $5,000 for it in its present condition. Q. I am asking you what your opinion of the value would be in the condition it is now? A. Not over $5,000. The Court. How many acres altogether, 160?"

And from another:

"Q. Do you know what would be the fair reasonable value of that farm with the waters in Black Bear creek in the normal condition and pure? Mr. Lockevitz: At what time? Q. Now, what would be its fair value now if the waters were unpolluted and in its normal condition, what would that place be worth? A. About $100 an acre. Q. $100 an acre. And what would be its fair market value if the waters were in the polluted and corrupted condition? A. I wouldn't have it."

It will thus be seen that plaintiff made no attempt whatever to show the reasonable market value of the premises immediately

before the pollution. All her evidence was as to the value at the time of the trial, first, with the stream unpolluted and the trees not killed, and second, with it polluted and the trees killed as shown by the evidence.

This was clearly not the proper measure of damages, as it wholly failed to establish the value of the land before the injury, and such evidence alone, we think, has universally been held insufficient to support a verdict for substantial damages. Avery v. Wallace, 98 Okla. 155, 224 Pac. 515; Garwood v. Wheaton (Cal.) 60 Pac. 961; Cleveland, etc., Ry. Co. v. Vettel (Ind.) 133 N. E. 605; McDougald v. So. Pac. Ry. Co. (Col. App.) 98 Pac. 685; and McDougald v. So. Pac. Ry. Co. (Cal.) 120 Pac. 766.

In the latter case, as here, the proof was as to the value of the land at the time of the trial as it would be without the structures and as it really was at the time of the trial with the structures. It was held that this would allow the plaintiff the benefit of the general advance in value from all causes, and that such evidence alone would not support a judgment for $1,200.

Although the evidence of plaintiff was insufficient to support a verdict for $4,000, we think it was not error to overrule the demurrer to plaintiff's evidence. There was a breach of duty shown, and, though the evidence of plaintiff is insufficient to support a verdict and judgment for substantial damages, plaintiff was entitled to nominal damages, under the provisions of section 6015, C. O. S. 1921, which reads:

"When a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages."

The second question is: Did the court err in submitting the question of permanent damages to the jury?

When the cause was called for trial, defendants moved the court

"to require the plaintiff to elect on what theory she is attempting to recover in this case, the petition showing on its face that she is seeking a recovery on inconsistent theories, and consequently we want to be advised upon what theory of the case the plaintiff will seek to recover."

It was not pointed out what these inconsistent theories were claimed to be, but from what followed it fairly appears that defendants were presenting the proposition that plaintiff's petition alleged both temporary and permanent damages, and that it was defendant's contention that plaintiff should be required to stand upon one or the other.

The court, after some argument by counsel relative to the petition, made the following pertinent and sensible suggestion:

"The Court: They can recover partly for both, partly for permanent injuries, and partly for temporary. It would be proper to set them out in two separate counts in the petition."

The plaintiff, however, did not see fit to act upon this suggestion and so amend her petition, and defendants made no motion to require plaintiff to set out in separate counts her alleged permanent and temporary damages.

Defendants were apparently complaining because plaintiff had pleaded certain permanent injuries, but stated that she was claiming only for the damage done to the date of the petition.

Throughout the trial, both parties apparently took the position that the damages were permanent rather than temporary. As heretofore stated, plaintiff proved the pollution of the stream and the destruction of the timber, substantially as alleged in the petition. There was no attempt made to prove the value of the use of the premises for the time from the first pollution of the stream to the filing of the petition, although she did produce proof tending to show that she was deprived of the use of the premises for stock raising and grazing purposes for practically two years. No attempt whatever was made by defendants to refute the evidence of plaintiff as to the pollution of the stream and the destruction of the timber, except as to the number of trees destroyed. There was some conflict in the evidence on this point. Defendants, in attempting to refute the evidence of plaintiff on the amount of damages, produced their evidence almost in its entirety, upon the basis of permanent injury. That is, by proof tending to show the value of the farm immediately prior to the pollution and its value at the date of the trial, though one of defendants' witnesses testified upon cross-examination in explaining how he arrived at the value of the farm, that its rental value for grazing purposes was about $300 per year.

Defendants took the attitude throughout the trial that the damage to plaintiff's land or at least the source or cause of the damage, was permanent. Their counsel stated, in effect, that they had done everything in reason to abate the flow of salt water, and

294

one of defendants, in substance, pleaded this in its answer.

The court instructed the jury in one paragraph of the instructions as to the measure of damages based upon a temporary damage, and in another paragraph as to the measure of damage based upon permanent damages, telling the jury therein that if they should find from the evidence that the cause of the injury could not be abated by the expenditure of labor or money, then the injury to plaintiff, if any, would be permanent, and that in such case the measure of damage would be the difference between the reasonable market value of the premises prior to and since the date of the pollution of the stream.

Defendant produced four witnesses who testified as to the measure of damages. They were asked specifically as to the value of the premises prior to the pollution and thereafter; two of them testified, in substance, to a difference in value of about $1,000. One testified, in substance, that there was no change in value, and one testified to about $2,400. To show the nature of the damages and the extent thereof sought to be shown by defendants' witnesses, we quote the following from the direct examination of one witness, Mr. J. B. Mason:

"Q. Now, Mr. Mason, you testified that you are familiar with Mrs. Allen's farm. Will you tell the jury what the reasonable market value of that farm was in the year 1925 before there was any pollution, what was it worth per acre on the market? A. Oh, about $50, I would think. Q. $50? A. Yes, sir. * * * Q. Now, Mr. Mason, what do you say would be the fair reasonable market value of this place in the condition it is in at the present time with the pollution on it? A. Well, about $35, I would think."

There was no error in submitting the issue of permanent damages in view of the contention of defendants, the answer of one of them, and the evidence produced by them.

Defendants cite Carter Oil Co. v. Kerley, 109 Okla. 69, 234 Pac. 737, and the recent case of Union Oil & Mining Co. v. Bowman, 144 Okla. 54, 289 Pac. 296, and contend that, under these authorities, there can be no permanent damage by the pollution of a stream by depositing therein salt water. They contend that in the Carter Oil Company Case, supra, this court has held that there could not be an award for permanent damages in a pollution case. Such is not the holding in that case. All that was

held therein was that, under the facts in the former case referred to therein involving the same land, the question of permanent injury was not an issue, and that the nuisance there complained of was abatable. A different position was taken by defendants at the trial. To avoid a result similar to the Carter Oil Company Case, and the former case therein referred to, whereby successive actions might be maintained, defendants apparently took the position, and the answer of one of them, in substance, pleaded, that the cause of the injury was not abatable, and that all had been done that could have been done within reason to abate the flow of salt water.

The holding in Union Oil & Mining Co. v. Bowman, supra, tends to support the plaintiff rather than defendants. Some language is used in that opinion which would indicate that the court would hold that depositing either a small or large quantity of common salt in a stream would not of itself create a permanent injury to the stream. But this statement is specifically based upon the assumption that the escapement of the salt into the stream would terminate at some future time, not too remote. But it was held that where, in addition to salt water, oil, and base sediment were deposited in a stream and caught fire and destroyed timber along the banks, a verdict of a jury finding that these agencies produced a permanent injury would not be disturbed. There can be no difference in principle where the trees are destroyed by salt water alone.

Carter Oil Co. v. Kerley, supra, was relied upon in Comar Oil Co. v. Hackney, 119 Okla. 285, 250 Pac. 93. In distinguishing the Carter Oil Co. Case, the court said:

"Here is the substantial natural drainage of refuse from a great oil field, admitted by defendants by their testimony and in open court, to have been unabatable by the expenditure of labor and money. Certainly, defendants are not in position now to claim that the same was so abatable. We concur with them, that this entire oil field ought not to be annihilated and abolished by injunction herein, or on action by the state, or otherwise, simply to prevent the admitted necessary pollution of lands of plaintiffs."

The assumption spoken by the learned Commissioner in Union Oil & Mining Co. v. Bowman, supra, could not be indulged where the record as here shows the structures causing the pollution are in their nature permanent. We apprehend the probable cessation in such case would be "too remote."

The injury to the land in the instant case is not as extensive as in the latter case, but otherwise we can see no difference in principle. In Mid-Co. Gasoline Co. v. Back, 95 Okla. 29, 217 Pac. 1041, it was held:

"Although the source of plaintiff's damages may be susceptible of remedy or abatement, a requested instruction limiting the amount of the plaintiff's recovery to such damage as has accrued on account of the impaired or lost use of his property up to the time of the suit, is properly refused by the trial court in the absence of any evidence that the injury complained of is susceptible of remedy or abatement."

Certainly, it could not be said that the destruction of the trees shown by the evidence was susceptible of remedy or abatement. In addition thereto, the jury by their verdict, after having viewed the premises, found the injuries to plaintiff's land were of such a nature that they cannot be abated by the expenditure of labor or money, and that said injuries are of a permanent nature.

Certainly we cannot say, as a matter of law, that there can be no permanent injury to land by the deposit of salt water in a stream, where, in addition to the pollution of the water in the stream, trees are killed or the soil itself rendered unproductive, and where the source or cause of such pollution is such as to be nonabatable, or from structures in their nature permanent.

The jury by the verdict found specifically:

"That the injuries to plaintiff's land are of such a nature that they cannot be abated by the expenditure of labor or money, and that said injuries are of a permanent nature, and we further find the amount of her recovery at the sum of $4,000."

The next day after the verdict was returned, and in the absence of defendants, plaintiff asked and obtained leave to amend her petition "to conform to the proof." The amendment made was, in substance, to strike out certain statements in the petition to the effect that "if the pollution continues, said land will be still further reduced in value, but plaintiff is only complaining of the damage to this date," and insert in lieu thereof an allegation "that said pollution and damage is permanent in character." Defendants complain of the allowance of this amendment as error. This alleged error was not presented in the motion for new trial, and is therefore not properly here for consideration.

We now consider the question of the sufficiency of the evidence to sustain the judg-

ment. This question is raised by a number of assignments.

We have shown that plaintiff's evidence of itself was insufficient to sustain a judgment for substantial damages, though sufficient to support a judgment for nominal damages.

After defendants' demurrer to plaintiff's evidence was overruled, defendants themselves produced evidence supplying to some extent the omission of plaintiff. We will not again quote from the record, as what we have already referred to shows from defendants' own witnesses that plaintiff's farm was worth from $1,000 to $2,400 less, after the pollution of the stream and the killing of the trees, than before.

In Oklahoma Hospital v. Brown, 87 Okla. 46, 208 Pac. 785, it was held:

"Where defendant demurs to the evidence of the plaintiff in chief, and afterwards introduces evidence, which supplies the omission or defect in the evidence of the plaintiff, the error in overruling the demurrer is cured, and the ruling thereon becomes harmless."

In Bales v. Breedlove, 96 Okla. 280, 222 Pac. 542, it was held:

"Where the district court overrules a demurrer to plaintiff's evidence, and thereafter both parties proceed with the trial and introduce further and additional evidence, and sufficient evidence is introduced to make a case for the plaintiff, a judgment rendered and entered in his favor on a verdict for plaintiff will not be disturbed."

In Gulf, C. & S. F. Ry. Co. v. Beasley, 67 Okla. 27, 168 Pac. 200, it was held:

"Where a demurrer to plaintiff's evidence is overruled, and defendant thereupon proceeds to offer testimony, and in so doing supplies any omission in the plaintiff's testimony, the error, if any, in overruling the demurrer, is cured."

In Glaze v. Metcalf Thresher Co., 67 Okla. 22, 168 Pac. 219, it was held:

"When defendant's demurrer to plaintiff's evidence was overruled and defendant thereafter offered evidence in his own behalf upon the very point wherein he claimed plaintiff's evidence was deficient, and the cause was submitted to the jury without further exception to the sufficiency of the evidence, if, upon all the testimony in the case the judgment was properly rendered, it will not be disturbed on appeal."

It thus appears, that defendants supplied the evidence which defendants omitted, to wit, the diminution of the value of plaintiff's premises based upon the value thereof prior to and after the pollution of the stream,

to an amount, according to one witness, of $15 per acre, or a total of $2,400.

We, therefore, conclude that there is no competent evidence in the record to sustain a verdict and judgment of $4,000, but there is competent evidence to sustain a judgment for $2,400.

We are, therefore, of the opinion that the judgment is excessive and should be reversed, and the cause remanded for a new trial, unless plaintiff within 20 days file a remittitur of all the judgment in excess of $2,400, in which event the judgment should be affirmed.

BENNETT, LEACH, EAGLETON, and HERR, Commissioners, concur. TEEHEE, Commissioner, who sat in the oral argument, not present. SWINDALL, J., disqualified, and not participating.

By the Court: It is so ordered.

Note.—See under (1) anno. 38 A. L. R. 1388; 27 R. C. L. p. 1229; R. C. L. Perm. Supp. p. 6058. See "Appeal and Error," 4 C. J. §3006, p. 1020, n. 90; §3136, p. 1138, n. 63. "Trial," 38 Cyc. p. 1550, n. 46. "Waters," 40 Cyc. p. 600, n. 85; p. 601, n. 93.